**In re Garth BOSTROM and Becky Bostrom a/k/a Becky Dahlgren, Debtors.**

**George and Gabrielle Stathopoulos, Plaintiffs,**

**v.**

**Garth Bostrom and Becky Bostrom a/k/a Becky Dahlgren, Defendants.**

**Bankruptcy No. 01 B 04437.
Adversary No. 01 A 00748.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Nov. 27, 2002.

Samuel H. Levine, Arnstein & Lehr, Chicago, IL, Attorney for Plaintiffs.

Anthony S. DiVincenzo, Law Offices of Anthony S. DiVincenzo, Chicago, IL, Attorney for Defendants.

## MEMORANDUM OPINION

JOHN H. SQUIRES, Bankruptcy Judge.

This matter comes before the Court on the complaint filed by George and Gabrielle Stathopoulos (the "Creditors") objecting to the discharge of Garth and Becky Bostrom (collectively the "Debtors" and individually "Garth" and "Becky") pursuant to 11 U.S.C. § 727(a)(4)(A) and § 727(a)(5). For the reasons set forth herein, the Court grants judgment in favor of the Creditors under Counts I and II of the complaint. The Debtors' discharge is denied and the objections thereto under

§ 727(a)(4)(A) and § 727(a)(5) are sustained.

## I. *JURISDICTION AND PROCEDURE*

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. It is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

## II. *FACTS AND BACKGROUND*

This matter proves the old adage that money should never be borrowed from friends or relatives. Formerly, the Creditors and the Debtors were friends. The Debtors borrowed funds from the Creditors and granted them a junior mortgage on their home. The indebtedness was evidenced by a promissory note executed by the Debtors on June 20, 1998 in sum of $113,355.29. Due to financial problems, the Debtors were unable to service the debt. As a result, the Creditors filed a mortgage foreclosure action against the Debtors in the state court. *See* Creditors' Exhibit No. 3. The senior mortgage holder also filed a mortgage foreclosure action against the Debtors. *See* Creditors' Exhibit No. 4. Thereafter, the state court entered a judgment of foreclosure and sale and determined the amount owed by the Debtors to the Creditors was $135,081.00. *See* Creditors' Exhibit Nos. 5 and 6. The foreclosure sale was set for February 12, 2001. *See* Creditors' Exhibit No. 7. Prior thereto, however, on February 9, 2001, the Debtors filed a Chapter 7 bankruptcy petition. *See* Creditors' Exhibit No. 8. The Debtors scheduled the Creditors' claim as secured by a second mortgage on their residence in the sum of $144,868.95. *Id.* at Schedule D.

The Debtors' filed petition, Schedules and Statement of Financial Affairs were dated November 9, 2000. The Debtors met with their first attorney, Janet L. Watson, in October 2000, and brought to her information including Garth's most recent pay stub, tax returns, credit card debt, the status of the pending mortgage foreclosure actions, as well as their average monthly budget. *See* Debtors' Exhibit No. 11. Becky is a practicing attorney and Garth works as a consultant for Healthcare Business Consultants, Inc.

The Debtors' Schedule I estimated monthly gross wages for Garth of $8,000.00 and monthly take home pay of $7,250.00 and no income for Becky. *See* Creditors' Exhibit No. 8. Based on these amounts, his gross wages for the year 2000 would have been $96,000.00 and the net take home pay for that same year would have been $87,000.00. The monthly take home pay reflected on Schedule I did not include bonuses received by Garth. Garth had an arrangement with his employer whereby he would receive a draw against a non-guaranteed bonus of $5,000.00 per month. Those bonuses averaged approximately $150,000.00 for years 1999 and 2000.

The Debtors' Statement of Financial Affairs listed income for Garth for years 1998, 1999 and 2000 in the sums of $140,000.00, $290,749.00 and $177,000.00, respectively. *See* Creditors' Exhibit No. 8. Similar to the Schedule I, the Statement of Financial Affairs does not reflect any earned income for Becky. In fact, in marked contrast, the Debtors' 1998 and 1999 federal income tax returns Form 1099 and W–2 statements disclosed income earned by Becky for both tax years, as well as a substantially larger amount of income earned by Garth than what was reflected on the Statement of Financial Affairs. *See* Creditors' Exhibit Nos. 10–14. The Statement of Financial Affairs, Item 8, reflected gambling losses of

$60,000.00 and stock market losses of $20,000.00 for the year 2000. *See* Creditors' Exhibit No. 8. At his Bankruptcy Rule 2004 examination, Garth testified that his gambling losses for the year 2000 were closer to $200,000.00. *See* Exhibit C to Creditors' Complaint at p. 58, lines 8–11.

The Debtors' Schedule J listed total monthly expenses of $9,200.00, which included a mortgage payment of $4,850.00. *See* Creditors' Exhibit No. 8. In addition, Schedule J included a line item of $1,000.00 per month for payment of real estate taxes. It is undisputed, however, that the Debtors ceased making the senior mortgage payment in July 1999 and did not pay the 1998 or 1999 real estate taxes. Moreover, the Debtors admitted that they have not made any payments on the debt owed to the Creditors since January 1999. Schedule J listed "other" monthly expenses for "recreation; gifts" of $100.00. *Id.* The Debtors did not list an amount on the line for "recreation, clubs and entertainment, newspapers, magazines, etc."

The Debtors' Schedule B valued their household goods and furnishings at $750.00, which included bedroom, living room, and family room furniture. *See* Creditors' Exhibit No. 8. Subsequently, the Debtors made a more detailed list of their personal property items, which included a big screen television, two other television sets and a stereo system. *See* Creditors' Exhibit No. 26. Additionally, Schedule B listed one fur, a wedding ring set, a necklace and a bracelet valued at $400.00. *See* Creditors' Exhibit No. 8. The documents provided by the Debtors to their attorney in anticipation of the bankruptcy filing, however, showed that two fur jackets were owned by the Debtors, but only one was listed on Schedule B. *See* Debtors' Exhibit No. 11.

On June 8, 2001, the Debtors filed Amended Schedules A, D, E and an Amended Statement of Financial Affairs. *See* Creditors' Exhibit No. 9. The Amended Statement of Financial Affairs reflected $290,749.00 as income for the year 1999 for Garth and income of $15,839.00 for Becky, for a total income of $306,588.00. *Id.* Moreover, the Amended Statement of Financial Affairs showed $274,412.00 as income for the year 2000 for Garth and $26,664.73 for Becky, for a total income of $301,076.73. *Id.* Finally, the Amended Statement of Financial Affairs listed $11,833.34 as income for the year 2001 for Garth and no income for Becky. *Id.* Amended Schedule A listed three parcels of real estate located in Florida, valued at $900.00, which were not reflected on the original Schedule A. *Id.;* Creditors' Exhibit No. 8.

The Creditors filed this adversary proceeding on July 20, 2001. They allege in their two-count complaint that the Debtors' discharge should be denied pursuant to 11 U.S.C. §§ 727(a)(4)(A) and 727(a)(5). Specifically, the Creditors maintain in Count I of the complaint that the Debtors made several false statements in their Schedules, Statement of Financial Affairs and their Bankruptcy Rule 2004 examination, including: (1) understated monthly income because Garth's bonuses were not included; (2) overstated monthly expenses because mortgage and real estate tax payments were included even though they were not being paid; (3) understated gambling losses; and (4) incorrect annual income figures.

In Count II of the complaint, the Creditors maintain that the Debtors have not adequately explained what happened to their earned income. Specifically, the Creditors contend that the Debtors' income was sufficient to meet their liabilities. The Creditors argue that any estimate of the gambling losses for the years 1999 and 2000 is vague, indefinite and uncorroborated by documentation. Further-

more, the Creditors argue that the Debtors are unable to satisfactorily explain the difference between their earned income and their monthly expenses. The Court held an evidentiary hearing and the Debtors testified. Thereafter, the Court took the matter under advisement.

### III. *APPLICABLE STANDARDS FOR OBJECTIONS TO DISCHARGE*

 The discharge provided by the Bankruptcy Code is to effectuate the "fresh start" goal of bankruptcy relief. In exchange for that fresh start, the Bankruptcy Code requires debtors to accurately and truthfully present themselves before the Court. A discharge is only for the honest debtor. *In re Garman*, 643 F.2d 1252, 1257 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). Consequently, objections to discharge under 11 U.S.C. § 727 should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir.1996) (citations omitted). Because denial of discharge is so drastic a remedy, courts may be more reluctant to impose it than to find a particular debt nondischargeable. *Soft Sheen Prods., Inc. v. Johnson (In re Johnson)*, 98 B.R. 359, 367 (Bankr.N.D.Ill.1988) ("The denial of discharge is a harsh remedy to be reserved for a truly pernicious debtor.") (citation omitted). The plaintiff has the burden of proving the objection. *See* Fed. R. Bankr.P. 4005; *In re Martin*, 698 F.2d 883, 887 (7th Cir.1983) (the ultimate burden of proof in a proceeding objecting to a discharge lies with the plaintiff). The objector must establish all elements by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966–67 (7th Cir.1999).

### IV. *DISCUSSION*

#### A. *11 U.S.C. § 727(a)(4)(A)*

 Section 727(a)(4)(A) provides:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account.

11 U.S.C. § 727(a)(4)(A). The purpose of § 727(a)(4) is to enforce the Debtors' duty of disclosure and to ensure that the Debtors provide reliable information to those who have an interest in the administration of the estate. *See Brandt v. Carlson (In re Carlson)*, 231 B.R. 640, 655 (Bankr. N.D.Ill.1999), *aff'd*, 250 B.R. 366 (N.D.Ill. 2000), *aff'd*, 263 F.3d 748 (7th Cir.2001); *Bensenville Community Center Union v. Bailey (In re Bailey)*, 147 B.R. 157, 163 (Bankr.N.D.Ill.1992) (citations omitted).

 In order to prevail, the Creditors must establish five elements under § 727(a)(4)(A): (1) the Debtors made a statement under oath; (2) the statement was false; (3) the Debtors knew the statement was false; (4) the Debtors made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Bailey*, 147 B.R. at 162 (citations omitted). If made with the requisite fraudulent intent, a false statement, whether made in the schedules or orally at an 11 U.S.C. § 341 creditors' meeting, is sufficient grounds for denying a discharge provided it was knowingly made and is material. *Armstrong v. Lunday (In re Lunday)*, 100 B.R. 502, 508 (Bankr.D.N.D. 1989) (citation omitted). It is a debtor's role to carefully consider the questions posed on the schedules and at the creditors' meeting, and answer them accurately and completely. *Id.*

In *In re Yonikus*, 974 F.2d 901 (7th Cir.1992), the Seventh Circuit Court of Appeals held that a debtor's failure to list

a pre-petition personal injury and worker's compensation claim on his schedules constituted grounds for revocation of the debtor's discharge (the *Yonikus* trustee sought to revoke debtor's discharge under 11 U.S.C. § 727(d)(2), the post-discharge equivalent to § 727(a)(4)(A)). In rejecting the debtor's argument that the worker's compensation award was exempt and the personal injury claim was property of his employer and not him, the court stated, "[d]ebtors have an absolute duty to report whatever interests they hold in property, even if they believe their assets are worthless or are unavailable to the bankruptcy estate." *Id.* at 904 (citations omitted).

▮ Turning to the matter at bar, the Creditors first must establish that the Debtors made a statement under oath. A debtor's petition and schedules constitute a statement under oath for purposes of a discharge objection under § 727(a)(4). *See Nof v. Gannon (In re Gannon),* 173 B.R. 313, 320 (Bankr.S.D.N.Y.1994) (citations omitted). The Schedules and Statement of Financial Affairs filed by the Debtors constitute statements under oath. Moreover, testimony given at a Federal Rule of Bankruptcy Procedure 2004 examination also constitutes a statement under oath for purposes of § 727(a)(4). *See Northeast Alliance Fed. Credit Union v. Garcia (In re Garcia),* 260 B.R. 622, 631 (Bankr. D.Conn.2001); *Peoples Bank of Charles Town v. Colburn (In re Colburn),* 145 B.R. 851, 857 (Bankr.E.D.Va.1992). Hence, there is no dispute that this element has been met.

▮ Second, the Creditors must show that such statements were false. Whether the Debtors made a false oath within the meaning of § 727(a)(4)(A) is a question of fact. *Williamson v. Fireman's Fund Ins. Co.,* 828 F.2d 249, 251 (4th Cir.1987); *Continental Ill. Nat. Bank & Trust Co. of Chicago v. Bernard (In re Bernard),* 99 B.R. 563, 570 (Bankr. S.D.N.Y.1989) (citing *Williamson*). "Filing of false schedules with material omissions or misrepresentations with an intent to mislead creditors and the trustee as to a debtor's actual financial condition constitutes a false oath under section 727(a)(4)(A)." *Britton Motor Serv., Inc. v. Krich (In re Krich),* 97 B.R. 919, 923 (Bankr.N.D.Ill.1988) (citation omitted). While the Court does not expect every individual item of clothing or piece of furniture to be scheduled and valued, or that each scheduled liability be listed with absolute arithmetic precision, there comes a point when the aggregate errors and omissions cross the line past which a debtor's discharge should be denied. *See Netherton v. Baker (In re Baker),* 205 B.R. 125, 133 (Bankr.N.D.Ill.1997) (debtor's failure to disclose his tropical fish hobby and its assets, including over 100 fish tanks, constituted grounds for denial of his discharge); *A.V. Reilly Int'l, Ltd. v. Rosenzweig (In re Rosenzweig),* 237 B.R. 453, 457 (Bankr.N.D.Ill.1999) (debtor's failure to disclose an income tax refund and a second computer constituted grounds for denial of his discharge).

▮ Wherever that fine and elusive line is, the Court is of the view it has certainly been crossed here. The Court can understand that occasionally there may be an innocently omitted de minimis asset, but here the omission of three parcels of real property in Florida from the original Schedule A, and one fur coat, three television sets and a stereo system from the original Schedule B is simply too substantial to overlook or attribute to mere negligence or inadvertence on the part of the Debtors. More significantly, the original Statement of Financial Affairs omitted substantial income earned by the Debtors. Specifically, the document did not list any income earned by Becky for

the year 1999. However, the Amended Statement of Financial Affairs listed her income for that year at $15,839.00. In addition, the original Statement of Financial Affairs disclosed income earned by Garth for the year 2000 of $177,000.00 and did not list any income earned by Becky. The Amended Statement of Financial Affairs, however, revealed income for the year 2000 for Garth in the sum of $274,412.00 and $26,664.73 for Becky. Further, the Debtors' original Schedule I listed monthly net income of $7,250.00 from Garth's employment, but did not reflect his bonuses. The Schedules filed in this case are in direct and material conflict with the documentary evidence admitted at trial, namely the Debtors' federal income tax returns, which further point to the falsity of the statements made in this case by the Debtors.

■ These are substantial omissions from the original Statement of Financial Affairs that cannot be excused by way of amendment. Subsequent voluntary disclosure through amendment to the schedules or testimony does not expunge the falsity of the oath. *Bailey*, 147 B.R. at 165 (citation omitted). As explained in *In re Shebel*, 54 B.R. 199, 203 (Bankr.D.Vt.1985):

> Section 727(a)(4)(A) does not provide for a grace period within which one can undo a false statement, made under penalty of perjury, by later declaring the truth. Nor is there any authority for the proposition that the amendment of a false statement requires the Court to pretend that the statement originally made was true.

A debtor's amendment of his schedules does not bar denial of discharge. *Rogers v. Boba (In re Boba)*, 280 B.R. 430, 435 (Bankr.N.D.Ill.2002). "The operation of the bankruptcy system depends on honest reporting. If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive." *Payne v. Wood*, 775 F.2d 202, 205 (7th Cir.1985).

■ Furthermore, Garth's testimony that he did not read the petition, Schedules and Statement of Financial Affairs, but rather, signed them blindly, does not serve as an excuse for these omissions. Rather, it aggravates the serious dereliction and failure to file complete and reasonably accurate papers that disclose the Debtors' true financial condition. Also, the fact that Becky is an experienced attorney weighs against the credibility of her testimony that she signed both the original and amended filings without checking their accuracy. As an attorney, Becky should know that signing a document under the pain of perjury, without reading same or checking the accuracy of the information contained therein, does not serve to insulate her from being held bound to what she signed. The Seventh Circuit Court of Appeals, in the context of signing income tax returns, unequivocally stated that "[p]eople are free to sign legal documents without reading them, but the documents are binding whether read or not." *Novitsky v. American Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 702 (7th Cir.1999) (citation omitted).

The Debtors were unable to explain and reconcile the differences between the filed papers in this case and the markedly different reality of their assets and true income and actual expenses, except to ascribe it to Garth's gambling, business-related entertainment expenses, and the Debtors' day-to-day living expenses. The Debtors were unable to specify the average monthly amount they spent for entertainment. Admittedly, they failed to list any entertainment expense in Schedule J. Becky explained that this line item was intentionally left blank because the

monthly amount fluctuated. Becky testified that they went out frequently to restaurants with family and friends, and that Garth enjoyed paying the bill with their credit cards. *See, e.g.,* Debtors' Group Exhibit No. 7. Moreover, Schedule J lists a monthly mortgage payment and a payment for real estate taxes, even though the Debtors admittedly stopped paying their mortgage in July 1999 and did not pay their real estate taxes for years 1998 and 1999.

Becky testified that Garth's gambling losses for 1998, 1999 and 2000 totaled $32,890.00, $20,131.00 and $41,691.00, respectively. *See* Debtors' Group Exhibit Nos. 1–3. The Debtors stated that these exhibits did not include all of Garth's losses because some of the betting tickets were not retained. Garth's gambling losses for 2001 have not been totaled. *See* Debtors' Group Exhibit No. 4. The Debtors' Statement of Financial Affairs listed gambling losses of $60,000.00 for the year 2000. *See* Creditors' Exhibit No. 8. Garth testified that this amount was a low guesstimate. Both Garth and Becky testified that Garth incurred more excessive gambling losses because he gambled at offtrack betting facilities, casinos and on various sporting events. Becky testified that Garth's gambling escalated through the years.

Garth could not quantify how much he lost gambling because he did not obtain any documents from the casino quantifying his losses for the years 1998 through 2001. Garth testified that his gambling losses and entertainment expenses, which he did not quantify, accounted for the difference between the couple's income and expenses for the years 1999–2001. His gambling level was such that one casino issued him a premier card, which allowed him to receive complimentary beverages, food and other services. *See* Debtors' Exhibit No. 6.

Garth only kept those losing tickets to offset the occasional winnings for income tax reporting purposes. He testified he had no large winnings over the course of his gambling.

It is undisputed that Garth is an excessive gambler. The Statement of Financial Affairs, however, only lists gambling losses of $60,000.00 for the year 2000. Nevertheless, Garth testified at the creditors' meeting, that this amount was closer to $200,000.00. The Debtors never amended the Statement of Financial Affairs to reflect this significantly higher amount. Hence, the Court finds that the Statement of Financial Affairs was false regarding Garth's gambling losses.

In summary, the Court finds that the Schedules, the Statement of Financial Affairs and the amendments thereto were incomplete and failed to disclose all of the Debtors' earned income, three parcels of Florida real property, various items of personal property, Garth's true gambling losses and entertainment expenses and their accurate monthly expenditures. Thus, the Creditors have established this element regarding the falsity of the Schedules and Statement of Financial Affairs and the amendments thereto.

Third, the Creditors must establish that the false statements were knowingly made. The Court finds that this element has been satisfied. The Debtors are intelligent, experienced and articulate business people who knew their personal and business situation, and thus, knew or should have known that the original Schedules and Statement of Financial Affairs and amendments thereto were incomplete and inaccurate as previously discussed.

Fourth, the Creditors must prove that the Debtors made the false statements with fraudulent intent. To find the requisite degree of fraudulent intent,

the Court must find that the Debtors knowingly intended to defraud or engaged in behavior which displayed a reckless disregard for the truth. *Yonikus*, 974 F.2d at 905; *Bailey*, 147 B.R. at 165 (citing *Yonikus*). If a debtor's bankruptcy schedules reflect a "reckless indifference to the truth" then the plaintiff seeking denial of the discharge need not offer any further evidence of fraud. *Calisoff v. Calisoff (In re Calisoff)*, 92 B.R. 346, 355 (Bankr. N.D.Ill.1988) (citation omitted). The requisite intent under § 727(a)(4)(A) may be inferred from circumstantial evidence. *Yonikus*, 974 F.2d at 905 (citations omitted); *Carlson*, 231 B.R. at 655. However, discharge should not be denied where the untruth was the result of mistake or inadvertence. *Lanker v. Wheeler (In re Wheeler)*, 101 B.R. 39, 49 (Bankr.N.D.Ind. 1989).

■ The Court readily infers the requisite fraudulent intent from the totality of the evidence. The testimonial and documentary evidence clearly shows that the Debtors knew of the existence of the Florida real property and the other undisclosed personal property including a second fur coat, three television sets and a stereo system. Further, the Debtors admitted that their scheduled income and monthly expenses were inaccurate. Finally, Garth testified that his gambling losses significantly exceeded those reflected on the Statement of Financial Affairs. At the very least, the Debtors demonstrated a reckless disregard or indifference to the truth of their situation. *See Calisoff*, 92 B.R. at 355; *Croge v. Katz (In re Katz)*, 203 B.R. 227, 235 (Bankr.E.D.Pa.1996) (existence of more than one falsehood, plus failure to clear up all inconsistencies when filing amendments may constitute a reckless disregard and be sufficient for denial of discharge).

■ The Debtors argue that they relied on the advice of their counsel in executing the petition, Schedules, Statement of Financial Affairs and amendments thereto. Moreover, the Debtors contend that at the time the original Schedules were filed, they did not have complete information concerning Garth's gambling losses for the year 2000. Finally, they maintain that any inaccuracy was the product of inadvertenance, mistake or neglect, and not an intent to defraud. The Debtors cannot rely on the advice of counsel defense regarding errors in the Schedules and Statement of Financial Affairs where the Debtors have declared under penalty of perjury that they have read the documents, and to the best of their knowledge, the documents were true and correct. *See Davis, Mannix & McGrath v. Fawell (In re Fawell)*, Ch. 7 Case No. 98 B 01274, Adv. No. 98 A 01306, 1999 WL 569449 at *14 (Bankr.N.D.Ill. July 26, 1999) (citation omitted). The Court does not doubt the integrity and professionalism of the Debtors' original attorney and her long proven track record before the Court in many cases over the years.

■ Moreover, the fact that the petition, Schedules and Statement of Financial Affairs were signed by the Debtors in November 2000, but not filed with the Court until February 2001, does not serve to negate the Debtors' ongoing duty to provide full and accurate information. That they provided further information upon the trustee's request after the creditors' meeting, does not excuse their failure to file the original Schedules and Statement of Financial Affairs with as accurate and complete information as was available to them at the time. Certainly, the Debtors had access to their respective earned incomes for 1998 through 2000. Most of this information would have been available to the Debtors in November 2000 and all

of it should have been available by February 2001. Hence, the Court rejects as disingenuous the Debtors' excuse that the lag time between when the initial documents were signed and when they were filed three months later accounts for the discrepancy with respect to their income.

Finally, the Creditors must show that the statements related materially to the bankruptcy case. A debtor's false oath must relate to a material matter before it will bar a discharge in bankruptcy. *In re Agnew*, 818 F.2d 1284, 1290 (7th Cir.1987) (citation omitted). The test for materiality of the subject matter of false oath is whether it " 'bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property.' " *Bailey*, 147 B.R. at 162 (quoting *In re Chalik*, 748 F.2d 616, 618 (11th Cir.1984)). A false oath may be material even though it does not result in any detriment or prejudice to the creditor. *Scimeca v. Umanoff*, 169 B.R. 536, 543 (D.N.J.1993), *aff'd*, 30 F.3d 1488 (3d Cir.1994); *Congress Talcott Corp. v. Sicari (In re Sicari)*, 187 B.R. 861, 881 (Bankr.S.D.N.Y.1994). When a debtor is in doubt concerning disclosure, it is unquestioned that he is obligated to disclose. *See Bank of India v. Sapru (In re Sapru)*, 127 B.R. 306, 315–16 (Bankr.E.D.N.Y. 1991) ("multitude" of false oaths and omissions were material and justified denial of discharge). The Court finds that the above discussed errors and omissions from the Schedules and Statement of Financial Affairs are material to the bankruptcy case, therefore satisfying this element.

After considering the totality of the evidence, the Court finds that the Creditors have shown by a preponderance of the evidence each element under § 727(a)(4)(A). Therefore, the Court denies the Debtors' discharge on this ground.

## B. *11 U.S.C. § 727(a)(5)*

Section 727(a)(5) provides that "[t]he court shall grant the debtor a discharge, unless … the debtor has failed to explain satisfactorily … any loss of assets or deficiency of assets to meet the debtor's liabilities…." 11 U.S.C. § 727(a)(5). "Section 727(a)(5) is broadly drawn and clearly gives a court broad power to decline to grant a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *Martin*, 698 F.2d at 886 (citations omitted). The Court is not concerned with the wisdom of a debtor's disposition of assets, but is concerned with the truth, detail and completeness of the debtor's explanation of the loss. *See In re D'Agnese*, 86 F.3d 732, 735 (7th Cir.1996).

There are two stages of proof with respect to § 727(a)(5). *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 955 (Bankr.N.D.Ill.1995). First, the party objecting to discharge has the burden of proving that the debtor at one time owned substantial and identifiable assets that are no longer available for his creditors. *Id.* (citation omitted). Second, if the party objecting to the discharge meets this burden, then the debtor is obligated to provide a satisfactory explanation for the loss. *Id.* (citation omitted).

What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the Court. *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir.1966); *Olson v. Potter (In re Potter)*, 88 B.R. 843, 849 (Bankr.N.D.Ill.1988). Although the explanation does not necessarily need to be comprehensive, it must meet two criteria in order to be deemed "satisfactory." *Bryson*, 187 B.R. at 956. First, it must be supported by at least some documentation. *Id.* Second, this doc-

umentation must be sufficient to "eliminate the need for the Court to speculate as to what happened to all the assets." *Id.* A debtor's explanation, however, must consist of more than "a vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Baum,* 359 F.2d at 814. Instead, "it must be a good faith explanation of what really happened to the assets in question." *Potter,* 88 B.R. at 849. "To be satisfactory, the explanation must demonstrate the debtor has exhibited good faith in conducting his affairs and explaining the loss of assets." *Bay State Milling Co. v. Martin (In re Martin),* 141 B.R. 986, 999 (Bankr.N.D.Ill.1992) (citations omitted). A debtor "cannot abuse the bankruptcy process by obfuscating the true nature of his affairs and then refusing to provide a credible explanation." *Johnson,* 98 B.R. at 366 (quoting *Martin,* 698 F.2d at 888).

Even though a satisfactory explanation must be convincing about this lack of concealment, the focus of the inquiry is not exclusively on the subjective nature or honesty of the debtor's explanation, but is also on the objective adequacy of such explanation. *See D'Agnese,* 86 F.3d at 734–35. Furthermore, a debtor's failure to satisfactorily justify a substantial loss of assets need not be the product of fraudulent intent. *Gannon,* 173 B.R. at 317. An objecting plaintiff must prevail on two issues, however: the disappearance of substantial assets and a lack of a satisfactory explanation for this disappearance. *First Commercial Fin. Group, Inc. v. Hermanson (In re Hermanson),* 273 B.R. 538, 546 (Bankr.N.D.Ill.2002).

The Court finds that the Creditors have demonstrated that the Debtors at one time owned substantial and identifiable assets that are no longer available for their creditors. The Debtors, however, have not satisfactorily explained the loss of these assets. The Debtors summarily attribute the loss of assets to: (1) Garth's excessive gambling; (2) Garth's entertainment expenses incurred in order to generate business; and (3) the Debtors' penchant for fine dining and high living. The Debtors have inadequate corroborative records for Garth's gambling losses and business entertainment expenses incurred in 1999 and 2000. Additionally, they were unable to quantify the exact amount they spent during that time for personal entertainment. They allege that the bank accounts, checking account overdrafts, the credit card statements and Garth's gambling losses fully account for all of the income. The Debtors contend that their documentary evidence demonstrates the extent of Garth's gambling losses, their spending habits and their entertainment expenses, and ultimately, the loss of assets. *See* Debtors' Exhibit Nos. 1–5, 7, 8, 12 and 13.

It is not the role of the Court to sift through the Debtors' bank records and credit card statements in an attempt to determine the loss of assets or categorize how they spent more than they earned. The Debtors have the burden of satisfactorily explaining the disappearance of assets. The Debtors have not met this burden. The Debtors argue that if the Court were to subtract their checks written on their bank account from their income, the remainder would reflect Garth's gambling losses and the entertainment expenses, and thus explain the loss of assets. Even if the Court were able or inclined to perform this accounting, which the Debtors should have done, but did not, the figure, whatever it is, is not supported by any evidence, other than the Debtors' testimony that the loss must be attributed to Garth's excessive gambling and entertainment expenditures. While the Court does not doubt the credibility of the undisputed testimony regarding Garth's heavy gam-

bling, this testimony, coupled with the incomplete and unorganized documentary evidence, does not constitute a satisfactory explanation for the loss of assets for purposes of § 727(a)(5). Rather, the documentary and testimonial evidence proffered by the Debtors constitutes a vague, indefinite and uncorroborated hodgepodge of financial transactions.

Consequently, the Court finds that the Debtors failed to provide a satisfactory explanation for their loss of assets and dissipation of their income. Thus, the Court grants judgment in favor of the Creditors pursuant to Count II of the complaint and holds that the Debtors' discharge is denied under § 727(a)(5).

## V. CONCLUSION

For the foregoing reasons, the Court hereby grants judgment in favor of the Creditors under Counts I and II of the complaint. The Debtors' discharge is denied and the objections thereto pursuant to § 727(a)(4)(A) and § 727(a)(5) are sustained.

This Opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate order shall be entered pursuant to Federal Rule of Bankruptcy Procedure 9021.